People v Sozio (2024 NY Slip Op 24165)

[*1]

People v Sozio

2024 NY Slip Op 24165

Decided on June 6, 2024

Supreme Court, New York County

Statsinger, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on June 6, 2024
Supreme Court, New York County

The People of the State of New York

against
Gino Sozio, Defendant.

Ind. No. 70510/23

People: Reginald Greene, Assistant District Attorney
Defense: Thomas Mirigliano, Esq.

Steven M. Statsinger, J.

On April 3, 2024, a jury convicted the defendant of one count of attempted assault in the first degree a hate crime (bias-motivated conduct), one count of assault in the second degree as a hate crime (bias-motivated conduct) and criminal possession of a weapon in the third degree. The jury acquitted him of two counts of assault as a hate crime under the "bias in selection of victim" theory of culpability. He now moves to set aside the verdict pursuant to Criminal Procedure Law (hereafter "C.P.L.") § 330.30 (1), raising four separate claims. For the reasons that follow, the motion is DENIED.
I. The Evidence Supporting the Two Hate Crime Convictions Was Legally Sufficient.
Defendant argues that the evidence was legally insufficient to support the statutory requirement that defendant's actions were committed in "whole or substantial part" based on the complainant's perceived race, national origin, ancestry, or expression of religion and religious practice. P.L. § 485(1)(b). The court denied the defendant's motion for a trial order of dismissal on this same issue.
Whether on appeal or at the § 330.30 motion stage, the standard for determining legal sufficiency post-conviction is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307,(1979); People v. Contes, 60 NY2d 620 (1983). That standard was amply met here.
The video evidence clearly shows the defendant using anti-Muslim racial slurs before, during and after the slashing of the complainant. This evidence alone is sufficient for any rational jury to find the defendant guilty of a hate crime. In addition, the jury was entitled to disregard the defendant's self-serving testimony that, amongst other things, he only called the complainant and his friends "Halals" because he had just seen the word Halal on the food truck, Trial Transcript ("T." ) at 629-30 (at total of 5 times), and that referring to these young men as "Halals," while "offensive," was not "racism." T. at 670.
The jury was also free to reject defendant's testimony that his use of the N-word was mere "street slang" and was not reflective of bias because it was directed at the "group" and not "to a certain person." T. at 672.
And, lastly, the Court rejects defendant's argument that the complainant himself testified [*2]that he did not think that the attack was racially motivated. This claim is belied by the record. The complainant testified on direct examination that:
A: So, [defendant] started off with: This is my F'in country. And he was like  it was  I felt like it was more racially motivated, the way he was staying stuff. I can't remember a hundred percent exactly what he was saying. And it got to the point where my friend was like, this is not right. And he started recording.
Q: What made you think it was racially motivated? Do you remember any of the statements that he was saying?
A: Yeah. I mean, he came down to saying: You guys bring your wives and children from back home to get blown up, stuff like that. Like I don't know. It was just a lot of like bad stuff, like.
T. at 298. Emphasis added.
In this making argument, the testimony the defense relies on was not evidence; it was a prior statement that the complainant made in the grand jury that was used for impeachment purposes only. It was not evidence of the truth of its content. The trial evidence clearly shows that the complainant did believe this assault to be racially motivated.
For these reasons, the Court finds that the evidence was legally sufficient.
II. The Court Did Not Erroneously Define the Word "Substantial."
The effort to quantify something intangible—such as a victim's level of pain or a defendant's degree of bias—is no easy task; it presents nearly intractable linguistic tangles. The available words such as "substantial," "considerable," "in principal part" and the like, are just not all that helpful. And Court of Appeals apparently agrees. In People v. Chiddick, 8 NY3d 445 (2007) the court observed that " 'substantial pain' cannot be defined precisely, but it can be said that it is more than slight or trivial pain."
Here, during deliberations the jury sent out a note requesting: "a definition of 'substantial' in regard to the hate crime charges. In count nine 'substantial pain' is defined as 'more than a little'. For counts one, two, four, five, seven and eight, what does substantial mean? Phrasing: In whole or in substantial part, because of a belief or perception of the race, color, national origin, et cetera." T. at 878. After a discussion with both counsel, the Court responded to the note, over defense objection, by saying that "Substantial means more than a little, or if that helps you, more than slight or trivial." T. at 882. The Court made a lengthy record supporting this definition and adheres to that reasoning here.
First, the Court noted that it charged the jury on the counts that had "physical injury" as an element that, physical injury meant "substantial pain," and that substantial meant "more than a little." T. at 846, 849. This explanation to the jury went without objection. T. at 846, 849. The Court believed that it would confuse the jury to define the same term differently across two different penal statutes. T. at 881. Thus, in response to the note, the Court defined the word "substantial" in a manner that was consistent with the definition it had given for the same term in the "physical injury" counts: "Substantial means more than a little, or if that helps you, more than slight or trivial." T. at 882.
The Court made a lengthy record in support of this ruling and explained why it disagreed with the decision in People v. Fox, 17 Misc 3d 281, 292 (Sup. Kt. Kings County 2007), which held that the word "substantial" in the hate crimes statute meant "a considerable portion or amount." The Court's reasons, in brief, were:
First, that the defense did not object to the Court's definition of "substantial" in the [*3]counts with a "physical injury" element. T. at 881.
Second, that "more than slight or trivial" was the definition of "substantial" that the Court of Appeals used in Chiddick, 8 NY3d at 447 (2007), when discussing "substantial pain." T. at 881.
And, lastly, the Court gave a detailed analysis of why defining "substantial" as "more than slight or trivial" was appropriate. Perhaps if penal statutes were strictly construed in New York, which is the traditional rule of construction, the Court's analysis might have been different. But they are not. According to P.L. § 5, penal statutes are not "strictly construed." They are "construed according to the fair import of their terms to promote justice and effect the objects of the law." Id. The Court found that defining "substantial" as "more than a little"—and not "considerable"—was more consistent with this provision.
The Court noted that in its view, the "fair import" and "object" of the hate crimes statute was to give "maximum protection" to "vulnerable and marginalized groups," and therefore the statute should not by limited in application those to cases where "the conduct was only motivated by a lot of bias." T. at 880.
Defendant disagrees with this characterization of the "object" of the hate crimes legislation, arguing instead that its purpose was not to give maximum protection to marginalized and vulnerable groups, but rather to expose hate crimes offenders to an enhanced punishment.
Defendant's formulation is really just an adoption of the Court's own reasoning, but phrased differently. Increased penalties are not a stand-alone legislative goal. The only reason to enact enhanced penalties for hate crimes, or indeed for any crime, is to utilize the potential penalty as a means of protecting victims. The enhanced penalties in the hate crimes legislation do so in a number of ways. They: 1) deter hate crimes from occurring in general; 2) incapacitate those who commit them for longer periods, and; 3) deter recidivism. In fact, enhanced penalties are pretty much the only ways to achieve those goals via legislation. Thus, subjecting more people to enhanced penalties for bias crimes—which is the consequence of the Court's definition of "substantial"—rather than fewer, which is the consequence of the definition of "substantial" in Fox — gives victims greater protection.
This Court remains of the view that the hate crimes statutes should cast a wide net and that this is better achieved by construing the word "substantial" as "more than slight or trivial," and not "considerable."
III. Defendant Was Not Entitled to a Justification Charge.
During the charge conference, the Court gave several reasons why there was no reasonable view of the evidence that would support a justification charge, even accepting as true defendant's testimony that he "felt threatened." T. at 715. The Court stands by those reasons.
First, the Court again rejects the assertion that it would be objectively reasonable to conclude that when "Mamoun" held a phone up to defendant's face to film him (defendant was at the time making and ani-Muslim statements), he became the initial aggressor. While Mamoun was filming, he can be heard saying, in substance, "why do you hate?" — hardly aggressive or threatening language. Rather, defendant was the initial aggressor: he threw the first punch when he hit or slapped Mamoun in order to get him to drop the phone.
Defendant's own account of the encounter with Mamoun was "so now what do I think is going to happen? I don't know. It's still verbal at the point. I get a kid walking up to me and literally shoving a phone in my face. It's about to touch my face so I slapped the phone. What am I supposed to do?" T. at 566. But this explanation falls flat. Defendant had many other options: [*4]He could have asked Mamoun to move the phone, walked away, or asked one of the other young men present to intervene. There is no reasonable view of defendant's testimony that would suggest that it was reasonable for him to believe that the use of physical force, let alone deadly physical force, was necessary to defend himself against Mamoun's phone. Defendant never testified that Mamoun's wielding of the phone caused him fear, or led him to believe that Mamoun would use the phone as a weapon, or that the phone was a signal that Mamoun was going to escalate the encounter to a physical one. The truth is, defendant's testimony boils down to this simple fact: Mamoun's behavior made the defendant angry, so he hit him.
Nor is there any evidence that would have justified using deadly physical force against any of the other young men at the scene. First, assuming arguendo that Mamoun's wielding of the phone amounted to the threat of physical force, defendant used deadly physical force against the complainant, and he was the only person involved in this incident to use or threaten the use of this level of force.
While defendant testified that the young men beat or hit him before he returned to the scene with his knife and slashed the complainant, that at most would have justified physical force in self-defense, not deadly physical force. The video evidence shows that men appeared calm and collected both immediately before and immediately after this alleged beating (which took place off-camera), and defendant did not testify that any of them had any type of weapon. To the contrary he acknowledged that they merely had "hands in the pockets." T. at 568 Thus, even if one or more of the young men did strike him, this would not have justified the use of deadly physical force to repel it. In that regard, this case is very much like People v. Rkein, 33 NY3d 1001 2019, in which the Court of Appeals found that where the victim forcefully pushed the defendant, deadly physical force in response was not justified. Similarly, in People v. Francis, 15 AD3d 318 (1st Dept. 2005), where a defendant "escalated what began as a fist fight by using deadly physical force against the victim," a justification charge was not warranted. The facts here, viewed in the light most favorable to the defendant, closely mirror those in Francis.
Defendant's use of his knife cannot even be seen as defensive; when he chased after the young men while swinging his knife wildly, he was decidedly not defending himself. He was attacking the young men.
Perhaps most importantly, defendant could have, with "complete personal safety," P.L. § 35.15(2)(a)—and should have—just left the area. But instead, he returned and escalated the violence. There was no justification for this behavior: defendant had the opportunity to safely retreat after he was beaten, and even started to do so. But then turned back and confronted the group of young men while brandishing his knife, thereby slashing the complainant. In his direct testimony, when asked, "Why didn't you leave after you got up?" defendant's initial reply was "I don't know." T. at 569. Even as he speculated further about why he did not retreat, defendant never once asserted that it would have been unsafe to do so. T. at 569. This is unsurprising, as it is clear from the record—particularly the video evidence—that the defendant could have safely retreated. The reason defendant began to retreat is because it was safe to do so, and it was solely his returning to the scene that made the situation dangerous.
Lastly, apart from defendant's puzzling decision to return and re-engage with these young men, he did so using deadly physical force—a degree of force that was plainly unjustified by any aspect of the his account of the incident. His testimony about returning to the scene was: 
There was three people standing in front of me. And at that point, I just wanted to get out of there and get back to where my friends were. So I was scared. I wanted to get home. I [*5]was thinking about my wife. I need to get back to my friends. I'm by myself.
I just started swinging, I started swinging the knife just to keep people at bay. That was it. I did swing the knife. I just wanted to keep everyone back from me. There was a lot of movement in the background. I don't know what's being planned.
T. at 568.
"[W]ant[ing] to get out of there" to rejoin his friends, "want[ing] to get home," "thinking about [his] wife," trying to keep the young men "at bay," or "keep [them] back from [him]," and "not knowing what was planned," even taken together, simply do not justify the use of deadly physical force in self-defense. Thus, defendant's testimony fails to show that he feared the use of deadly physical force against him, and fails to suggest that it would have been reasonable for him to use it himself.
The Court did not err in refusing to give a justification charge.
IV. The Unpreserved Claim about the Prosecutor's Summation Cannot Be Raised in a C.P.L. § 330.30 Motion.
Defense counsel did not object to the prosecutor's summation at the time the statements he now finds objectionable were made, nor did he avail himself of multiple other opportunities to do so. He did not object once the prosecutor finished his summation, nor at lunchtime when the Court inquired "anything for the record before we break?." Counsel's answer was "No, your Honor." T. at 817.
After lunch, the Court charged the jury and the jury began its deliberations, sending out its first note. At the end of that day, after discharging the jury, the Court again asked, "anything else for the record" and defense counsel again said, "No." T. at 864.
The next day, the second day of deliberations, the Court responded the jury's second and third notes. It was only after this that defense counsel registered an objection to the prosecutor's summation. T. at 871-72.
This woefully belated objection was clearly untimely, thus any claim relating to the prosecutor's summation is unpreserved. E.g., People v. Rudge, 185 AD3d 1214 (3d Dept. 2020) ("Defendant's claim of prosecutorial misconduct [in summation] was not preserved for appellate review as he failed to render contemporaneous objections to the subject statements when they were made."). See also People v. Scott, 267 AD2d (2d Dept. 1999); People v. Parker, 220 AD2d 815 (3d Dept. 1995); People v. Leach, 148 AD2d 751 (2d Dept. 1988) all noting that absent a contemporaneous objection, a claim of prosecutorial misconduct in summation is unpreserved.)
Defense counsel's failure to timely object, means that the issue cannot be entertained in a C.P.L. § 330.30(1) motion. That section provides that that such a motion must be based on a "ground appearing in the record which, if raised upon an appeal from a prospective judgment of conviction, would require a reversal or modification of the judgment as a matter of law by an appellate court." Emphasis added. Unpreserved claims cannot be reviewed on appeal "as a matter of law"—only under the Court's interest-of-justice jurisdiction—thus they cannot be raised in a C.P.L. § 330.30(1) motion. People v. Sudol, 89 AD3d 499-500 (1st Dept. 2011) ("Since a trial court lacks this Court's interest of justice jurisdiction, its power is far more limited, and it may only grant a CPL 330.30(1) motion where the error alleged has been preserved by a proper objection at trial.") See also People v. McGuire, 218 AD3d 1357 (4th Dept. 2023) (affirming denial of § 330.30(1) motion grounded on an unpreserved claim).
Indeed, appellate courts frequently reverse erroneous grants of C.P.L. § 330.30(1) motions for precisely this reason. E.g., Sudol, 89 AD3d 499-500; People v. Quinones, 228 AD2d [*6]190 (1st Dept. 1996) (reversing trial court's grant of a C.P.L. § 330.30(1) motion on an unpreserved claim, noting that "any review of defendant's argument in the interest of justice must await a possible future appeal by the defendant after sentencing"); People v. Everson, 303 AD2d 1027 (4th Dept)(same), aff'd, 100 NY2d 608 (2004).
The motion to set aside the verdict as to this unpreserved issue is denied.
V. Conclusion
For defendant's first three claims of error, the Court adheres to the rulings it made at the time. The fourth claim is unpreserved and thus a C.P.L. § 330.30(1) motion is not available. The motion to set aside the verdict is denied in its entirety.
This opinion constitutes the Decision and Order of the Court.
Dated: June 6, 2024
New York, New York
HONORABLE STEVEN M. STATSINGER
JUSTICE OF THE SUPREME COURT